Joel E. Elkins (SBN 256020)
jelkins@weisslawllp.com
**WEISSLAW LLP**
9107 Wilshire Blvd., Suite 450
Beverly Hills, CA 90210
Telephone: 310/208-2800
Facsimile: 310/209-2348

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STEPHEN BUSHANSKY, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>PIVOTAL SOFTWARE, INC., PAUL MARITZ, ZANE ROWE, MARCY S. KLEVORN, ROBERT MEE, MICHAEL S. DELL, EGON DURBAN, WILLIAM D. GREEN, and MADELYN LANKTON,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Stephen Bushansky ("Plaintiff"), on behalf of himself and all others similarly situated, upon information and belief, including an examination and inquiry conducted by and through his counsel, except as to those allegations pertaining to Plaintiff, which are alleged upon personal belief, alleges the following for his Class Action Complaint:

**NATURE OF THE ACTION**

This is a stockholder class action brought by Plaintiff on behalf of himself and all other public stockholders of Pivotal Software, Inc. ("Pivotal" or the "Company") against Pivotal and the members of Pivotal's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which Pivotal will be acquired by VMware, Inc. ("VMware") through its wholly owned subsidiary Raven Transaction Sub, Inc. ("Merger Sub") (the "Proposed Transaction").

2. On August 24, 2019, Pivotal issued a press release announcing that it had entered into an Agreement and Plan of Merger dated August 22, 2019 (the "Merger Agreement") to sell Pivotal to VMware. Under the terms of the Merger Agreement, each holder of Pivotal Class A common stock will receive $15.00 in cash for each share of Pivotal common stock they own (the "Merger Consideration"), other than shares held in the treasury of Pivotal or owned, directly or indirectly, by Dell Technologies Inc. ("Dell Technologies"),[1] EMC Equity Assets LLC, VMW Holdco LLC, VMware or Merger Sub. For each share of Pivotal Class B common stock that Dell Technologies owns, Dell Technologies will receive 0.0550 of a share of Class B common stock of VMware.

3. On November 27, 2019, Pivotal filed a Schedule 14A Definitive Proxy Statement (the "Proxy Statement") with the SEC. The Proxy Statement, which recommends that Pivotal stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) the Company's financial projections; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by the Special Committee of the Board's ("Special Committee") financial advisor, Morgan Stanley & Co. LLC

[1] VMware is a majority-owned subsidiary of Dell Technologies.

("Morgan Stanley"); and (iii) Morgan Stanley's and Company insiders' potential conflicts of interest. Defendants authorized the issuance of the false and misleading Proxy Statement in violation of Sections 14(a) and 20(a) of the Exchange Act.

4. In short, unless remedied, Pivotal's public stockholders will be irreparably harmed because the Proxy Statement's material misrepresentations and omissions prevent them from making a sufficiently informed voting or appraisal decision on the Proposed Transaction. Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §1331 (federal question jurisdiction).

6. The Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391 because: (i) the Company's principal executive offices are located in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

8. Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Pivotal.

9. Defendant Pivotal is a Delaware corporation, with its principal executive offices located at 875 Howard Street, Fifth Floor, San Francisco, California 94103. The Company was formed by EMC Corporation ("EMC") and VMware in April 2013 and provides a cloud-native platform that accelerates and streamlines software development. Pivotal's common stock trades on the New York Stock Exchange under the ticker symbol "PVTL."

10. Defendant Paul Maritz ("Maritz") has been Chairman of the Board since September 2016 and a director of the Company since April 2013. Defendant Maritz previously served as the Company's Chief Executive Officer ("CEO") from April 2013 through August 2015. Defendant Maritz served as VMware's CEO from July 2008 to August 2012, as its President from July 2008 to January 2011, and as a VMware director from July 2008 to December 2017. Defendant Maritz also previously served as Chief Strategist at EMC from September 2012 through March 2013.

11. Defendant Zane Rowe ("Rowe") has been a director of the Company since September 2016. Defendant Rowe has served as Chief Financial Officer ("CFO") and Executive Vice President of VMware since March 2016. Before joining VMware, defendant Rowe served as Executive Vice President and CFO of EMC from October 2014 through February 2016.

12. Defendant Marcy S. Klevorn ("Klevorn") has been a director of the Company since May 2016.

13. Defendant Robert Mee ("Mee") has been CEO and a director of the Company since August 2015. Defendant Mee previously served as the Company's Senior Vice President of Products and Research Development from April 2013 to August 2015 and was part of Pivotal's founding team in April 2013. Prior to joining Pivotal, defendant Mee led the Pivotal Labs Division at EMC from 2012 to April 2013.

14. Defendant Michael S. Dell ("Dell") has been a director of the Company since September 2016. Defendant Dell has been Chairman and CEO of Dell Technologies since October

2013, Chairman of Dell Inc. since he founded that company in 1984, and previously served as CEO of Dell Inc. from 1984 to July 2004 and resumed that role in January 2007. Defendant Dell is also a director and non-executive Chairman of the board of directors of VMware.

15. Defendant Egon Durban ("Durban") has been a director of the Company since September 2016. Defendant Durban has been a director of Dell Technologies since October 2013. Defendant Durban is a Managing Partner and Managing Director of Silver Lake Partners ("Silver Lake")[2] and is also a director of VMware.

16. Defendant William D. Green ("Green") has been a director of the Company since August 2015 and a director of Dell Technologies since September 2016. Defendant Green previously served as a director of EMC from July 2013 to August 2016 and as EMC's independent Lead Director from February 2015 to August 2016.

17. Defendant Madelyn Lankton ("Lankton") has been a director of the Company since October 2018.

18. Defendants identified in paragraphs 10-17 are referred to herein as the "Board" or the "Individual Defendants."

**OTHER RELEVANT ENTITIES**

19. VMware is a Delaware corporation with its principal executive offices located at 3401 Hillview Avenue, Palo Alto, California 94304. VMware originally pioneered the development and application of virtualization technologies with x86 server-based computing, separating application software from the underlying hardware. VMware is a majority-owned subsidiary of EMC and controlled by Dell Technologies. VMware's common stock trades on the New York Stock Exchange under the ticker symbol "VMW."

[2] As of July 2, 2019, Silver Lake beneficially owns approximately 16.6% of Dell Technologies Class B common stock and 34.6% of Dell Technologies Class C common stock.

20. Dell Technologies is a Delaware corporation that delivers integrated information technology solutions across customer segments. Dell Technologies is a holding company that conducts its business operations through its direct and indirect subsidiaries. Dell Technologies, through its subsidiaries, EMC and VMware, beneficially owns approximately 62.6% of the Company's Class A common stock and all of the Company's Class B common stock, representing approximately 94.4% of the Company's total voting power.

21. EMC is a Massachusetts corporation that manages businesses which play a role in the transformation of information technology. EMC is an indirect wholly-owned subsidiary of Dell Technologies.

22. Merger Sub is a Delaware corporation and a wholly owned subsidiary of VMware.

**CLASS ACTION ALLEGATIONS**

23. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Pivotal common stock (the "Class"). Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

24. Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

25. The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class. As of November 4, 2019, there were 105,538,574 shares of Company Class A common stock outstanding and 175,514,272 shares of Company Class B common stock outstanding. All members of the Class may be identified from records maintained by Pivotal or its transfer agent and may be notified of the

pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

26. Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

a) Whether defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

b) Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

c) Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

27. Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

28. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

29. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

30. Pivotal was formed in April 2013 by EMC and VMware. On April 20, 2018, Pivotal priced its initial public offering at $15.00 per share of Class A common stock. Pivotal provides a cloud-native platform for software development and information technology ("IT") operations. The

Company's platform, Pivotal Cloud Foundry ("PCF"), accelerates and streamlines software development by reducing the complexity of building, deploying and operating new cloud-native applications. Pivotal also offers its PCF customers a complementary strategic service platform, Pivotal Labs ("Labs"), to accelerate their adoption of the software development process. Pivotal provides its products and services across many industries, including media, retail, government, technology, and telecommunications.

31. The Company jointly markets and sells its products and services with Dell Technologies and VMware. Since announcing PCF in November 2013, the Company's subscription customer count had grown to 377 as of the end of fiscal year 2019.

32. On June 4, 2019, Pivotal announced its first quarter fiscal year 2020 financial results, including subscription revenue of $128.9 million and total revenue of $185.7 million, a 43% and 19% increase, respectively, compared to first quarter fiscal year 2019. Subscription customers grew to 383, a 13% increase from first quarter fiscal year 2019. Defendant Mee commented on the results, stating:

> We had a solid start to the year with 43% subscription growth and customer expansions continued to fuel our strong net expansion rate of 143%. However, sales execution and a complex technology landscape impacted the quarter. . . . We have taken steps to improve our execution, and remain confident in our strategy and market opportunity for the long term. Pivotal continues to be the best partner for organizations that want to modernize their most important applications.

33. On September 4, 2019, Pivotal announced its second quarter fiscal year 2020 financial results. For the quarter, subscription revenue was $135.0 million and total revenue was $193.0 million, a 38% and 17% increase, respectively, from the second quarter fiscal year 2019. Subscription customers grew to 397, a 12% increase compared to second quarter fiscal year 2019. Defendant Mee commented on the successful quarter, stating:

> Pivotal delivered a solid performance in the second quarter. We remain focused on customer success and winning new customers with our differentiated, multi-cloud platform. Subscription revenue growth of 38% and 17% total revenue growth were

> driven by customer expansions and new customer wins. . . . Our platform and strategic services enable enterprises to modernize their development practices and securely operate their most important applications across multi-cloud environments.

**The Proposed Transaction**

34. On August 22, 2019, Pivotal issued a press release announcing the Proposed Transaction. The press release states, in relevant part:

> PALO ALTO, Calif., Aug. 22, 2019 (GLOBE NEWSWIRE) -- VMware, Inc. (NYSE: VMW), a leading innovator in enterprise software, and Pivotal Software, Inc. (NYSE: PVTL), a leading cloud-native platform provider, today announced that the companies have entered into a definitive agreement under which VMware will acquire Pivotal for a blended price per share of $11.71, comprised of $15 per share in cash to Class A stockholders, and the exchange of shares of VMware's Class B common stock for shares of Pivotal Class B common stock held by Dell Technologies, at an exchange ratio of 0.0550 shares of VMware Class B stock for each share of Pivotal Class B stock. In total, the merger consideration represents an enterprise value for Pivotal of $2.7 billion. The Board of Directors of each of VMware and Pivotal have approved this transaction, following the recommendations of special committees composed of independent directors of each company. Following the close of the transaction, VMware will be positioned to deliver the most comprehensive enterprise-grade Kubernetes-based portfolio for modern applications.
>
> Pivotal is a technology leader that is transforming the way the world's largest companies build and run software applications. For the last six years, Pivotal has been at the leading-edge of modern software development, helping organizations transform how they build and run their most important applications. Pivotal offers a powerful set of assets including a leading developer-centric platform, tools and services that accelerate modern app development. Additionally, Pivotal is a major contributor to the Spring developer framework, which sees more than 75 million downloads per month. The company is fully embracing Kubernetes with the recent launch of Pivotal Spring Runtime for Kubernetes and the upcoming Pivotal Application Service for Kubernetes.
>
> VMware and Pivotal share a long history of collaboration and joint innovation, reflected in the co-development and launch of VMware Pivotal Container Service (PKS) in February of 2018. VMware has increased its Kubernetes-related investments over the past year with the acquisition of Heptio, and the Kubernetes founders, to become one of the top three contributors to Kubernetes. The combination of Pivotal's developer experience and assets with VMware's IT expertise and infrastructure will help deliver a comprehensive portfolio of products, tools and services necessary to build, run and manage modern applications on Kubernetes infrastructure with velocity and efficiency.
>
> "Kubernetes is emerging as the de facto standard for multi-cloud modern apps. We are excited to combine Pivotal's development platform, tools and services with VMware's

infrastructure capabilities to deliver a comprehensive Kubernetes portfolio to build, run and manage modern applications," said Pat Gelsinger, CEO of VMware. "Importantly, adding Pivotal to our platform, accelerates our broader Any Cloud, Any App, Any Device vision and reinforces our leadership position in modern multi-cloud IT infrastructure."

"The time is ideal to join forces with VMware, an industry leader who shares our commitment to open source community contributions and our focus on adding developer value on top of Kubernetes," said Rob Mee, CEO, Pivotal. "VMware has a proven track record of helping organizations run and manage consistent infrastructure in support of mission critical applications, and our two companies have already built a strong foundation on our successful VMware PKS collaboration. We look forward to continuing our work with VMware to provide even more value to customers building modern applications."

"The VMware Board of Directors is committed to creating value for all stockholders," said Karen Dykstra, Chairperson of the Special Committee of VMware's Board of Directors. "After a thorough and independent evaluation with its advisors, and working closely with the VMware management team, the Special Committee recommended the Board approve this transaction with Pivotal given its strong strategic and long-term value to the company and its customers."

**Details Regarding the Transaction**

Under the terms of the transaction, Pivotal's Class A common stockholders will receive $15.00 per share cash for each share held, and Pivotal's Class B common stockholder, Dell Technologies, will receive approximately 7.2 million shares of VMware Class B common stock, at an exchange ratio of 0.0550 shares of VMware Class B common stock for each share of Pivotal Class B common stock. This transaction, in aggregate, results in an expected net cash payout for VMware of $0.8 billion. The impact of equity issued to Dell Technologies would increase its ownership stake in VMware by approximately 0.34 percentage points to 81.09% based on the shares currently outstanding. VMware currently holds 15 percent of fully-diluted outstanding shares of Pivotal. The transaction is expected to be funded through cash on the balance sheet, accessing short-term borrowing capacity, and approximately 7.2 million shares of VMware Class B common stock to Dell. Closing of the transaction is subject to customary closing conditions including the approval of the merger agreement by the holders of at least a majority of the outstanding shares of Pivotal common stock not owned by VMware or Dell Technologies or their affiliates (a "majority-of-the-minority" vote) and is expected in the second half of VMware's fiscal year 2020, which ends January 31, 2020.

**<u>Insiders' Interests in the Proposed Transaction</u>**

35. Pivotal insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders. The Board and the Company's executive officers are conflicted

because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Pivotal.

36. Notably, shares of Pivotal common stock held by Dell Technologies are entitled to receive merger consideration that is different from the Merger Consideration the Company's holders of Class A common stock are set to receive. In connection with the Proposed Transaction, Dell Technologies will receive 0.0550 of a share of Class B common stock of VMware for each share of Pivotal Class B common stock that Dell Technologies owns.

37. Further, Pivotal directors and executive officers stand to reap substantial financial benefits for securing the deal with VMware. According to the Merger Agreement, certain Pivotal options and restricted stock units ("RSU") will be cancelled and exchanged for cash payments. As of October 15, 2019, the aggregate amounts payable to Pivotal's executive officers with regard to their options and RSUs vested at that time is approximately $63.2 million, and the aggregate amounts payable to Pivotal's directors for their options and RSUs is approximately $10.1 million.

38. Moreover, if they are terminated in connection with the Proposed Transaction, Pivotal's executive officers will receive substantial cash severance payments. According to the Proxy Statement, the aggregate value of the severance payments and benefits Pivotal's executive officers are set to receive as of October 15, 2019 is approximately $48.2 million.

***The Proxy Statement Contains Material Misstatements or Omissions***

39. The defendants filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to Pivotal's stockholders. The Proxy Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction or seek appraisal.

40. Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information or provides them with materially misleading information

concerning: (i) the Company's financial projections; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by the Special Committee's financial advisor, Morgan Stanley; and (iii) Morgan Stanley's and Company insiders' potential conflicts of interest.

***Material Omissions Concerning the Company's Financial Projections***

41. The Proxy Statement omits material information regarding the Company's financial projections.

42. The Proxy Statement sets forth that "[i]n the ordinary course of business, Pivotal's management prepared a forecast for the fiscal year ending January 31, 2020 ("fiscal year 2020") as well as a high-level outlook for the fiscal years ending January 29, 2021 ("fiscal year 2021") and January 28, 2022 ("fiscal year 2022") (collectively the "Initial Outlook"). In addition, Pivotal prepared a sensitivity analysis of the Initial Outlook." Proxy Statement at 79. The Proxy Statement fails, however, to disclose (i) the assumptions underlying the "Initial Outlook," (ii) the sensitivity analysis of the "Initial Outlook," and (iii) the assumptions underlying the sensitivity analysis.

43. The Proxy Statement further states that:

> In the ordinary course of business, following the end of Pivotal's first fiscal quarter ended May 2, 2019, Pivotal management reviewed Pivotal's operating performance for the first fiscal quarter of fiscal year 2020. Based on Pivotal's performance in the first fiscal quarter and management's view of Pivotal's business at the time, Pivotal management revised the forecast for fiscal year 2020, and the outlook for fiscal years 2021 and 2022 (the "Base Case"). Pivotal prepared a revised sensitivity analysis, including a "High Case," which reflects higher revenue and higher operating income assumptions, and a "Low Case," which reflects lower revenue and lower operating income assumptions (the "Base Case," "High Case" and "Low Case," collectively, the "Revised Outlook").

*Id*. at 80. The Proxy Statement fails, however, to disclose the difference in the assumptions underlying the "Initial Outlook" and "Revised Outlook."

44. The omission of this material information renders the statements in the "Financial Projections" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Morgan Stanley's Financial Analyses***

45. The Proxy Statement omits material information regarding Morgan Stanley's financial analyses.

46. The Proxy Statement describes Morgan Stanley's fairness opinion and the various valuation analyses it performed in support of its opinion. However, the description of Morgan Stanley's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, Pivotal's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Morgan Stanley's fairness opinion in determining whether to vote in favor of the Proposed Transaction or seek appraisal.

47. With respect to Morgan Stanley's *Public Trading Comparables Analysis*, the Proxy Statement fails to disclose the individual financial metrics for each of the comparable companies observed by Morgan Stanley in the analysis.

48. With respect to Morgan Stanley's *Discounted Equity Value Analysis*, the Proxy Statement fails to disclose Pivotal's net debt at the end of fiscal years 2022, 2023 and 2024.

49. With respect to Morgan Stanley's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the specific range of terminal values Morgan Stanley calculated for each of the projection cases utilized in the analysis; (ii) quantification of the inputs and assumptions underlying the discount rates ranging from 9.0% to 11.0%; (iii) the implied terminal multiples resulting from the analysis; (iv) Pivotal's net debt as of August 2, 2019; and (v) the fully diluted capitalization of Pivotal as of August 2, 2019.

50. Without such undisclosed information, Pivotal stockholders cannot evaluate for themselves whether the financial analyses performed by Morgan Stanley were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction. In other words, full disclosure of the omissions identified above is required in order to ensure that stockholders can fully evaluate the extent to which Morgan Stanley's opinion and analyses should factor into their decision whether to vote in favor of or against the Proposed Transaction or seek appraisal.

51. The omission of this material information renders the statements in the "Opinion of Financial Advisor to the Pivotal Special Committee (Morgan Stanley)" and "Financial Projections" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Morgan Stanley's and Company Insiders' Potential Conflicts of Interest***

52. The Proxy Statement fails to disclose material information concerning the potential conflicts of interest faced by Morgan Stanley and Company insiders.

53. The Proxy Statement sets forth:

> In the two years prior to the date of its opinion, Morgan Stanley and its affiliates provided financing services to VMware and have received fees in connection with such services of approximately $2 million. In addition, in the two years prior to the date of its opinion, Morgan Stanley and its affiliates provided financing services to Dell and other majority-controlled affiliates and portfolio companies of Dell that Morgan Stanley has been able to identify (the "Dell Group") and have received fees in connection with such services of approximately $30 million.

*Id*. at 54. The Proxy Statement fails, however, to disclose the specific services that Morgan Stanley and its affiliates provided to VMware and Dell Technologies and whether any of these services was in connection with a potential acquisition of Pivotal by VMware or Dell Technologies.

54. The Proxy Statement also fails to disclose material information concerning the conflicts of interest faced by Pivotal insiders.

55. The Proxy Statement sets forth that "[a]fter the signing of the merger agreement, VMware has had discussions regarding the potential terms of post-merger employment or consulting arrangements with Pivotal's executive officers." *Id*. at 101. The Proxy Statement, however, fails to disclose the identities of Pivotal's executive officers that engaged in discussions with VMware regarding post-merger employment or consulting arrangements and the specific details of the employment and retention-related discussions and negotiations that occurred between VMware and Pivotal's executive officers, including who participated in all such communications, when they occurred and their content. The Proxy Statement further fails to disclose whether any of VMware's proposals or indications of interest mentioned management retention, consulting arrangements or equity participation in the combined company.

56. Communications regarding post-transaction employment and merger-related benefits during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders

57. The omission of this material information renders the statements in the "Opinion of Financial Advisor to the Pivotal Special Committee (Morgan Stanley)," "Background of the Merger" and "Interests of Pivotal's Directors and Executive Officers in the Merger" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

58. The Individual Defendants were aware of their duty to disclose the above-referenced omitted information and acted negligently (if not deliberately) in failing to include this information in the Proxy Statement. Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other stockholders of Pivotal will be

unable to make an informed voting or appraisal decision in connection with the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

### Class Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

59. Plaintiff repeats all previous allegations as if set forth in full.

60. During the relevant period, defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

61. By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy Statement. The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants. It misrepresented and/or omitted material facts, including material information about the Company's financial projections, the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by Morgan Stanley, and Morgan Stanley's and Company insiders' potential conflicts of interest. The defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

62. The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction or seek to exercise their appraisal rights.

63. By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

64. Because of the false and misleading statements in the Proxy Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

**COUNT II**

**Class Claims Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

65. Plaintiff repeats all previous allegations as if set forth in full.

66. The Individual Defendants acted as controlling persons of Pivotal within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Pivotal, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

67. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

68. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of the Proxy Statement.

69. In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

70. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

71. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' conduct, Pivotal's stockholders will be irreparably harmed.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Pivotal, and against defendants, as follows:

A. Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to Pivotal stockholders;

C. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D. Declaring that defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

E. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: December 10, 2019

**WEISSLAW LLP**
Joel E. Elkins

By: */s/Joel E. Elkins*

Joel E. Elkins
9107 Wilshire Blvd., Suite 450
Beverly Hills, CA 90210
Telephone: 310/208-2800
Facsimile: 310/209-2348
-and-
Richard A. Acocelli
1500 Broadway, 16th Floor
New York, NY 10036
Telephone: 212/682-3025
Facsimile: 212/682-3010

*Attorneys for Plaintiff*